Campbell Oil Co. v. AmeriGas Propane, LP, 2016 NCBC 5.

STATE OF NORTH CAROLINA

COUNTY OF BLADEN

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 468

CAMPBELL OIL COMPANY; CAMPBELL
OIL COMPANY OF CLINTON, INC.;
LINDSEY CAMPBELL OIL COMPANY, INC.;
CAMPBELL OIL COMPANY OF
WHITEVILLE, INC.; CAMPBELL
BROTHERS, INC.; CAMPBELL
INVESTMENTS, INC.; CAMPBELL OIL &
GAS COMPANY OF RALEIGH, INC.; D.M.
CAMPBELL, JR., Individually and as Trustee
of the Irrevocable Trust Agreement dated
September 13, 1989 with Bonnie H.
Campbell, as Grantor; SYLVIA CAMPBELL,
Individually and as Trustee of the Irrevocable
Trust Agreement dated September 13, 1989
with Bonnie H. Campbell, as Grantor;
BRIAN D. CAMPBELL, Individually and as
Trustee for the Bonnie Campbell Irrevocable
Trust for the Children of Dallas M. Campbell,
Jr., U/A/D September 27, 2001; WESLEY S.
CAMPBELL, Individually and as Trustee for
the Bonnie Campbell Irrevocable Trust for
the Children of Dallas M. Campbell, Jr.,
U/A/D September 27, 2001; CHRISTOPHER
M. CAMPBELL, Individually and as Trustee
for the Bonnie Campbell Irrevocable Trust for
the Children of Dallas M. Campbell, Jr.,
U/A/D September 27, 2001 and DALLAS
MCQUEEN CAMPBELL III, Individually and
as Trustee for the Bonnie Campbell
Irrevocable Trust for the Children of Dallas
M. Campbell, Jr., U/A/D September 27, 2001,
    Plaintiffs

    v.

AMERIGAS PROPANE, LP,
    Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

OPINION AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT

   THIS CAUSE, designated a mandatory complex business case by Order of the Chief

Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b)

(hereinafter, references to the North Carolina General Statutes will be to "G.S."), and

assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") and Defendant AmeriGas Propane, LP's Motion for Summary Judgment ("Defendant's Motion") (collectively, "Motions"), pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). On August 21, 2015, the Court held a hearing on the Motions.

THE COURT, after reviewing the Motions, briefs in support of and in opposition to the Motions, the record evidence filed by the parties, the arguments of counsel, and other appropriate matters of record, CONCLUDES that the Motions should be GRANTED, in part, and DENIED, in part, as stated herein.

> *Brooks, Pierce, McLendon, Humphrey & Leonard LLP by Howard L. Williams, Esq., James C. Adams, II, Esq., and Craig D. Schauer, Esq. for Plaintiffs.*

> *Ellis & Winters LLP by Paul K. Sun, Jr., Esq. and Kelly Margolis Dagger, Esq., and Reed Smith LLP by James T. Hultquist, Esq. for Defendant AmeriGas Propane, LP.*

McGuire, Judge.

<u>PROCEDURAL HISTORY</u>

1.      On August 6, 2013, Plaintiffs filed their Complaint in this matter with the Bladen County Clerk of Superior Court. Plaintiffs' Complaint asserts the following three claims for relief: Claim One (Breach of Asset Purchase Agreement); Claim Two (Breach of AR Agreement); and Claim Three (Declaratory Judgment Regarding Covenant).

2.      On September 26, 2013, Defendant filed its Answer and Counterclaims, in which it asserts counterclaims for anticipatory breach of contract (Counterclaim One) and unjust enrichment (Counterclaim Two). Plaintiffs filed their reply to the Counterclaims on October 25, 2013.

3.      On June 1, 2015, Plaintiffs filed their Motion for Summary Judgment. Plaintiffs' Motion seeks summary judgment in Plaintiffs' favor on all of Plaintiffs' claims and Defendant's counterclaims.

4. Also on June 1, 2015, Defendant filed its Motion for Summary Judgment. Defendant's Motion seeks summary judgment in Defendant's favor on all of Plaintiffs' claims. Defendant's Motion does not seek summary judgment on either of Defendant's counterclaims.

5. The Motions have been fully briefed and argued, and are ripe for determination.

FACTUAL BACKGROUND

6. Beginning in the 1980s, Campbell operated a propane gas and fuel oil business in eastern North Carolina. The propane business was a tank installation and gas delivery business that delivered propane via truck to Campbell's residential and commercial propane customers from more than ten facilities in the area.

7. AmeriGas is a national propane company that serves residential, commercial, agricultural, and industrial customers throughout the United States. To grow its business, AmeriGas occasionally acquires propane operations from regional and local propane companies.

8. On October 2, 2007, Campbell and AmeriGas[1] executed an Agreement for Purchase and Sale of Assets ("APA").[2] The APA was entered into between various Campbell Oil companies ("Sellers"), AmeriGas, and individual Campbell family members and family trusts ("Owners").[3] In the APA, Campbell agreed to sell its entire propane operations, including its customers, the propane storage tanks located on the customers' property, interests in real property, tank leases, goodwill, and trade names, including "Campbell

[1] The purchaser under the APA was Titan Propane, LLC ("Titan"). Titan is a predecessor to AmeriGas, as is Heritage Propane, LLC. As used in this opinion, "AmeriGas" will refer to AmeriGas, Titan, and Heritage Propane.
[2] The specific provisions of the APA at issue in this case are set out below, in the Court's discussion of the Motions.
[3] For purposes of this Opinion and Order, Plaintiffs, including Sellers and Owners, will be collectively referred to as "Campbell."

Propane."[4] Campbell sold AmeriGas its offices and operations in in Elizabethtown, Clinton, Supply, Whiteville, Nashville, Macclesfield, Burgaw, Lumberton, and Youngsville, North Carolina. In exchange for Campbell's propane business, AmeriGas agreed to pay a cash sum at closing, minus a specific holdback amount intended to cover future claims that might arise under the APA.[5]

9. The APA also addressed three terms that are at issue in this case: (a) the sale of certain of Campbell's propane accounts receivable to AmeriGas; (b) representations and warranties regarding the condition and regulatory compliance of customer propane tanks Campbell sold to AmeriGas; and (c) a non-competition agreement that prohibited Campbell from engaging in the propane and other competitive businesses within 100 miles of any plant facility sold by Campbell to AmeriGas.[6]

*Accounts Receivable*

10. As part of the purchase, AmeriGas acquired Campbell's propane accounts receivable ("AR") that were outstanding for ninety days or less at the time of closing ("Current AR").[7] Campbell retained the accounts receivable that were outstanding for more than ninety days at the time of closing ("Old AR"), but provided AmeriGas the right, for a period of twelve months, to collect Old AR for Campbell. AmeriGas was to remit any Old AR that it collected, less a five percent collection fee, to Campbell on a monthly basis[8] Under this arrangement, AmeriGas was obligated to use its "best efforts" to collect this AR.[9]

11. Campbell provided AmeriGas with access to its electronically stored AR records for the purpose of extracting account balances for commercial customers. AmeriGas

---

[4] Def.'s Mot. Summ. J. Ex. 3, § 1. Hereinafter, citations to the APA will be simply to "APA."
[5] APA § 4.
[6] *Id.* § 8.5(a)(1).
[7] *Id.* § 3.1.
[8] *Id.* § 3.2.
[9] *Id.*

was to load the AR data into AmeriGas' own account-management system.[10] AmeriGas, however, failed to load at least some of the extracted information into the AmeriGas system.[11] Shortly after closing, a dispute arose regarding the proper collection of AR. For example, some of Campbell's customers erroneously paid Campbell for Current AR that should have been paid to AmeriGas. Other customers misdirected payments to AmeriGas for fuel-oil purchased from Campbell, and which was not part of the sale of Campbell's propane business. The parties engaged in significant discussions in as effort to resolve these issues. AmeriGas requested, and Campbell twice provided in April 2008 and May 2009, the list of the commercial customer accounts that were purchased by AmeriGas with the balances owed by each customer.[12] These lists clearly showed that, as of the date of closing, CM Lindsay & Sons ("CM Lindsay") and Antioch Baptist Medical Center ("Antioch Baptist"), the two AR accounts at issue in this litigation, owed a total of $111,107.83 in Current AR.[13] Campbell also repeatedly communicated with AmeriGas employees to review the commercial accounts. After Campbell refused to bear further burden for researching all commercial accounts and reporting the results to AmeriGas,[14] it appears that the parties' general practice was for AmeriGas to request information from Campbell regarding specific customer accounts, and that information would then be provided and those accounts settled.[15]

12.     On May 18, 2009, AmeriGas asked Campbell for account histories for the commercial accounts in the Lumberton, North Carolina district.[16] CM Lindsay and Antioch Baptist were accounts in the Lumberton district.  In response, Campbell forwarded account

---

[10] *See* Hughes Dep. 11, 25-30.
[11] Hatley Dep. 54-55.
[12] Dep. Exs. 68, 73.
[13] *Id.*
[14] *See* Dep. Ex. 50; Hardin Dep. 130.
[15] *See, e.g.,* Dep. Ex. 54 (providing information based on "the accounts that [AmeriGas] wanted researched").
[16] Dep. Ex. 52.

histories reflecting Current AR for Lumberton commercial accounts AmeriGas had purchased, but did not include information on the CM Lindsay and Antioch Baptist accounts.[17] CM Lindsay and Antioch Baptist had paid the Current AR to Campbell in the amount of $111,107.83, but Campbell did not notify AmeriGas about the payments.[18] Tracy Hardin, Campbell's Operations Manager, testified that in response to the May 18 request, Campbell only provided the account information for specific Lumberton district accounts for which AmeriGas had requested information prior to May 18, 2009.[19] It is undisputed that AmeriGas had never previously asked for specific information regarding CM Lindsay and Antioch Baptist.[20] The record evidence also shows that AmeriGas never contacted either CM Lindsay or Antioch Baptist to inquire about the status of those accounts prior to November 2009.[21]

13.     In the fall of 2009, the parties negotiated a resolution of the outstanding AR disputes between them. On October 22, 2009, AmeriGas sent a letter to Campbell requesting that Campbell pay AmeriGas the sum of $156,286.46, upon the receipt of which AmeriGas would "acknowledge[ ] no further claims against [Campbell] regarding Accounts Receivable issues."[22] By letter dated October 28, 2009, Campbell accepted the offer, tendering a check in that amount "to fully settle the Accounts Receivable issue" (the two letters collectively are hereinafter referred to as the "AR Agreement").[23]  AmeriGas accepted and subsequently negotiated the check.

---

[17] Dep. Ex. 53.
[18] *See* Dep. Ex. 53; *see also* Campbell's 2d Supp. Resps. To 3d Interrogs. At 2, Nos. 21 & 22 (Ex. F).
[19] Hardin Dep. 142-43.
[20] Hardin Dep. 143-44.
[21] Hatley Dep. 97.
[22] Compl. Ex. A.
[23] *Id.* Ex. B.

14.    After entering into the AR Agreement, AmeriGas learned that Campbell had collected the Current AR on the CM Lindsay and Antioch Baptist accounts.[24] On August 3, 2010, AmeriGas notified Campbell that it intended to "enforce [its] right of setoff" and withhold $111,107.83 from future payments owed to Campbell under the parties' non-competition agreement ("August 3, 2010 Letter").[25] AmeriGas subsequently withheld this sum from the 2010 and 2011 payments it made to Campbell.

15.    Campbell contends that AmeriGas was not entitled to withhold from the payments because the APA only granted AmeriGas the right to collect Current AR from customers, and not directly from Campbell by way of withholding, and because the APA did not impose a duty to disclose to AmeriGas the Current AR payments Campbell had received from CM Lindsay and Antioch Baptist.[26] Campbell also argues that AmeriGas released any claim to outstanding accounts receivable in the AR Agreement.[27]

*Customer Storage Tanks*

16.    Among the assets Campbell sold to AmeriGas were customer propane storage tanks owned by Campbell but located on the customers' property.[28]  After the closing of the sale, AmeriGas discovered that in May 2007 the North Carolina Department of Agriculture had issued notices to Campbell that eight of its customer tanks were not installed in full compliance with state regulations.[29] The notices were sent to the local office of Campbell Oil for the district in which the violations were discovered, and came to the attention of a district level manager.[30] It is undisputed, however, that none of the Owners had actual knowledge of

---

[24] Julian Dep. 152-53.
[25] Compl. Ex. C.
[26] Pls.' Br. Supp. Mot. Summ. J. pp. 14-18.
[27] Compl. Exs. A, B.
[28] Compl. ¶ 49.
[29] Dep. Ex. 6 (filed under seal).
[30] Campbell Dep. p. 47; Def.'s Br. Supp. Mot. Summ. J. p. 28.

either the reports or the existence of non-compliant tanks.[31] The notices of violations were not disclosed to AmeriGas prior to the closing of the sale.[32] After learning about the notices, AmeriGas conducted further investigation and discovered that 319 customer storage tanks were not compliant with regulations and needed to be remediated.[33]

17.    In the August 3, 2010 Letter, AmeriGas notified Campbell that the failure to disclose the non-compliant customer tanks breached Campbell's representations and warranties in section 7.5 of the APA.  AmeriGas asserted that it was entitled "to full indemnification under the" APA.[34] In the same letter, AmeriGas informed Campbell that it had received a bid to perform the remediation work for $353,000.00.[35] AmeriGas stated that it would exercise its right to setoff and withhold the costs for the tank remediation from future payments owed to Campbell under the parties' non-competition agreement.

18.    Campbell does not dispute that there were tanks that were not in compliance with State regulations.  Instead, Campbell contends that the sale of the non-compliant tanks did not violate the representations in section 7.5 of the APA because that section applies only to the real property Campbell sold to AmeriGas.  Campbell argues that the only representations or warranties regarding the customer tanks in the APA were in section 7.3, and that section 7.3 only warranted that the Owners had no actual knowledge of non-compliant tanks. [36]  It is undisputed that the Owners had no actual knowledge of the tank compliance issue.

*Non-Competition Agreement*

---

[31] Campbell Dep. pp. 46-47.
[32] Dep. Ex. 6.
[33] Dep. Ex. 6; Compl. ¶ 50.
[34] Compl. Ex. C. *See also* APA § 10.1 (providing that the $250,000.00 indemnification "deductible" would not apply to, among other things, breaches of Section 7.5).
[35] *Id.*
[36] *See* Pls.' Br. Opp. Def.'s Mot. Summ. J. 12-16.

19.     The APA also contained a "Covenant Not to Compete" that barred Campbell, and the individual owners of Campbell, for a period of ten years from the closing of the sale from "engag[ing] in the business of propane or propane-related products, natural gas, or electric distribution within a 100 mile radius of any of the Plant Facilities" ("Restricted Area") sold by Campbell to AmeriGas.[37] The non-competition agreement contained a severability provision that permitted amendment of its restrictions as follows:

> If the terms of this Section 8.5 are held by any court or agency to be unenforceable because of the period of time in which those terms remain in effect, the breadth of the activities restricted, or the breadth of the geographical area of the limitations, then, nevertheless, this section shall be deemed to have been amended to limit that time period, those activities, or that area to the longest time period, the broadest activities and the largest geographical area (not to exceed those set forth in this section) as will be enforceable.[38]

20.     AmeriGas agreed to pay $2,000,000.00 above the amount paid for the purchase of Campbell's assets as consideration for the non-competition agreement, to be made in five equal, annual payments of $400,000.00.[39]  The non-competition agreement gave AmeriGas the right offset against the annual payments for "any claim or breach arising under [the APA], including any Damages as defined in Section 10.1" regardless of whom the claim or breach is against.[40]

21.     AmeriGas made the five annual payments but withheld from the 2010 and 2011 payments a total of $388,065.83 as offsets for the CM Lindsay and Antioch Baptist ARs and for the net cost of remediating the customer tanks.[41] AmeriGas made the last of the payments in October 2012.

---

[37] APA § 8.5(a).
[38] *Id.* § 8.5(e).
[39] Defendant notes that, in total, the purchase of Campbell's propane business was a "$23 million acquisition." Def.'s Br. Supp. Mot. Summ. J. p. 1.
[40] *Id.* § 8.5(f).
[41] AmeriGas apparently paid Campbell $1,611,934.17 of the $2,000,000.

22.     In 2013, Campbell purchased the operations of Brooks Oil Company ("Brooks") in Whiteville, North Carolina and Parnell Oil Company ("Parnell") in Parkton, North Carolina. On August 20, 2013, Campbell set up Five Star Propane, LLC ("Five Star"). Five Star then acquired Brooks on August 30, 2013, and Parnell on October 31, 2013. Five Star currently distributes propane out of offices in Whiteville and Parkton. Five Star's Whiteville location is approximately one mile from one of the facilities Campbell sold to AmeriGas.[42]

23.     Campbell, apparently conceding that operating Brooks' propane business would violate the terms of the non-competition agreement, argues that the non-compete is unenforceable and seeks a declaratory judgment to that effect. AmeriGas, however, contends that the non-compete is enforceable under North Carolina law and that the Brooks purchase was in violation of that provision. Alternatively, if the non-compete is found to be unenforceable, AmeriGas seeks an order requiring Campbell to return payments made as consideration for the non-compete under an unjust enrichment theory.

<u>DISCUSSION</u>

24.     Campbell moves, pursuant to Rule 56(a), for summary judgment in its favor on all of its claims against AmeriGas and, pursuant to Rule 56(b), for summary judgment in their favor on AmeriGas' counterclaims. Pursuant to Rule 56(b), AmeriGas moves for summary judgment in its favor on Campbell's claims.

25.     "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting Rule 56(c)). An issue is "material" if its "resolution . . . is so essential

---

[42] Def.'s Br. Supp. Mot. Summ. J. pp. 4-5.

that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235 (1972) (quotations omitted). The moving party bears "the burden of clearly establishing lack of a triable issue" to the trial court. *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011) (quoting *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310 (1976)). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Variety Wholesalers, Inc.,* 365 N.C. at 523 (quoting *Dobson v. Harris*, 352 N.C. 77, 83 (2000)).

26. The Court will first address claims related to the AR issue, followed by the tank remediation claims, and, finally, the parties' claims concerning the validity of the non-compete contained in the APA.

<u>Accounts Receivable Claims</u>

27. In its First and Second Claims for Relief, Campbell contends that AmeriGas wrongfully withheld $111,107.83 in payments for the CM Lindsay and Antioch Baptist ARs in violation of the APA and the AR Agreement. The parties have cross-moved for summary judgment on these claims.

28. As an initial matter, the parties disagree as to which party bears the burden of proof on the propriety of withholding payments based on the accounts receivable issue. Campbell contends that AmeriGas has the burden of proving that Campbell breached the APA entitling AmeriGas to the offset because section 8.5(f) of the APA is a "condition subsequent." AmeriGas argues that section 8.5(f) does not create a condition subsequent, but rather is an affirmative covenant giving AmeriGas the right to offset the payments. Accordingly, it is Campbell's burden to prove that AmeriGas' breached the APA by withholding the payments.

29. As our court of appeals has noted, "a condition subsequent is any event the existence of which, by agreement of the parties, operates to discharge a duty of performance

that has arisen." *Henderson & Corbin, Inc. v. West Carteret Water Corp.*, 107 N.C. App. 740, 743-44 (1992) (internal citations omitted); 17A Am. Jur. 2d Contracts § 464 (2014) ("A condition subsequent to an enforceable contract is a term of the contract, within the intent of the parties, that the happening or nonoccurrence of an event after the contract becomes binding upon the parties . . . causes the contract to terminate without further duties and obligations on any party."). The significance of a contractual provision being a condition subsequent is that the burden of proving the occurrence of the condition rests on the party asserting the condition. *See Yale v. Nat'l Indem. Co.*, 664 F.2d 406, 410 (4th Cir. 1981).

30. The Court is not persuaded that section 8.5(f), which provides that AmeriGas "*shall be entitled* to offset any claim or breach arising under [the APA],"[43] creates a condition subsequent. Rather, by its plain terms section 8.5(f) grants AmeriGas the unilateral right to offset against its payments for any claim against, or breach by, AmeriGas under the APA. It does not require AmeriGas to prove such claim or breach before exercising its right. The language also does not expressly or impliedly state that a breach or claim against Campbell discharges a duty of performance by AmeriGas or terminates the parties' mutual obligations under the APA. *Henderson & Corbin, Inc.*, 107 N.C. App. at 743-44; 17A Am. Jur. 2d Contracts § 464. To require AmeriGas to take steps to initiate litigation and prove a claim or breach by Campbell before being entitled to offset would render section 8.5(f) meaningless. Rather, that section gives AmeriGas the unilateral right to deduct the amount of such claims from the payments it is obligated to make, the exercise of which Campbell can challenge, as it has done in this lawsuit.

31. Additionally, even if the language were ambiguous, the Court would feel constrained to interpret section 8.5(f) as an affirmative covenant granting AmeriGas a right

---

[43] APA § 8.5(f).

under the APA, and not a condition subsequent. 17A Am. Jur. 2d Contracts § 464 ("Where the language used is ambiguous and may import either a condition subsequent or a covenant, it will be construed to be the latter in preference of the former."). Ultimately, the Court concludes that section 8.5(f) does not create a condition subsequent, but instead is a covenant that provides AmeriGas with the affirmative right to offset any claim or breach under the APA.

32. Campbell argues that AmeriGas wrongfully withheld from its payments under the non-competition agreement for the amounts of Current AR retained by Campbell for the CM Lindsay and Antioch Baptist accounts. Campbell's position is that it was under no obligation to provide to AmeriGas the misdirected payments it collected from CM Lindsay and Antioch Baptist because the APA conveyed to AmeriGas only the "right to collect" Current AR from its customer and did not impose an obligation on Campbell to remit misdirected payments to AmeriGas.

33. While the APA does not expressly provide that Current AR collected by Campbell must be remitted to AmeriGas, North Carolina courts have recognized that the terms of a contract are not limited to the express terms agreed upon by the parties. Instead, "[t]here is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract." *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228 (1985) (internal citations omitted). Moreover, "[i]t is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 40 N.C. App. 743, 746 (1979).

34. AmeriGas argues that Campbell's collection and retention of the CM Lindsay and Antioch Baptist payments deprives AmeriGas of one of the benefits of the APA, and therefore breaches Campbell's obligations under that agreement. The Court agrees. First

and foremost, the APA does not state that Campbell is selling AmeriGas only the "right to collect" Current AR. Rather, the APA states that AmeriGas in purchasing "all of Sellers' propane only accounts receivable that are outstanding for ninety (90) days or less" and defines such accounts as the "Purchased Accounts Receivable."[44] Section 3.1 does not contain any reference to AmeriGas merely having a right to collect or attempt to collect the Current AR. The only use of the term "right to collect" is contained in Section 3.2 of the APA regarding AmeriGas' right to collect Old AR and to keep a 5% collection fee if it collected any Old AR. Campbell's continued collection and retention of Current AR is inconsistent with the sale of the Current AR to AmeriGas.

35. Campbell argues that a conclusion that the APA required it to cease collecting Current AR and to provide to AmeriGas misdirected payments for Current AR imposes new obligations on Campbell that are not explicitly contained in the APA.[45] To the contrary, the obligation to cease collection of Current AR that it sold to AmeriGas and account for any misdirected payments simply constituted the reasonable, good faith efforts necessary to perform its obligation under the APA. *See Weyerhaeuser Co.*, 40 N.C. App. at 746.

36. Our court of appeals has found that similar conduct not only was a breach of the agreement between the parties, but also the tort of conversion. In *Lake Mary, L.P. v. Johnston*, the defendant, Hugh Johnston, sold a shopping center to the plaintiff and, as part of the sale, specifically sold his "right, title and interest in and to all leases . . . affecting the [p]roperty," which, noted the court, "would necessarily include the right to all tenant rent checks received after the closing date." 145 N.C. App 525, 532 (2001). Notwithstanding this transfer, Johnston continued to collect and deposit rent checks from his former tenants after he sold the shopping center. As here, it was the continued collection of rents by

---

[44] APA § 3.1.
[45] *See* Pls.' Br. Opp. Def.'s Mot. Summ. J. p. 9.

Johnston after he transferred his right to collect those rents that the court found wrongful. *See id.*[46]

37. For the reasons discussed above, the Court concludes that the collection and retention of Current AR, specifically the CM Lindsey and Antioch Baptist Accounts, constitutes a "claim or breach arising under" the APA upon which AmeriGas was entitled to offset the amounts of payments received on those accounts under section 8.5(f). This conclusion, however, does not end the Court's inquiry. Instead, even if the collection and retention of the CM Lindsey and Antioch Baptist accounts constitutes a claim or breach under the APA, Campbell contends that AmeriGas released any such claim in the AR Agreement.

38. "A release is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised." *Fin. Servs. of Raleigh, Inc. v. Barefoot*, 163 N.C. App. 387, 392 (2004) (internal citations omitted). Such an agreement "operates as a merger of, and bars all right to recover on, the claim or right of action" covered by the release. *Id.* (citing *Jenkins v. Fields*, 240 N.C. 776, 778 (1954). The scope of a release generally covers

> the matters expressed therein which are already in existence at the time of the giving of the release. Accordingly, demands originating at the time a release is given or subsequently, and demands subsequently maturing or accruing, are not as a rule discharged by the release unless expressly embraced therein or falling within the fair import of the terms employed.

---

[46] The court in *Johnston* did note, in determining that directed verdict against Johnston on the plaintiff's conversion claim was proper, that "[t]he evidence . . . shows that Hugh Johnston had an obligation to forward these checks to Lake Mary." *Johnston*, 145 N.C. App. at 532. The origin of such an obligation, whether contractual or otherwise, is unclear. However, as discussed above, the contractual promise that Campbell would transfer the Current AR would necessarily impose an obligation on Campbell's part to cease collecting that AR as part of a reasonable effort necessary to perform its obligation to transfer Current AR to AmeriGas. *See Weyerhaeuser Co.*, 40 N.C. App. at 746.

*Id.* at 394 (citing *Travis v. Know Creek, Inc.*, 321 N.C. 279, 282 (1987). As noted in *Barefoot*, however, North Carolina courts have "long recognized that parties may release existing but unknown claims." 163 N.C. App. at 394-95.

39.     On October 22, 2009, AmeriGas wrote to Campbell offering that, "[u]pon receipt of the agreed amount of $156,286.46, Titan Propane LLC acknowledges no further claims against Campbell Oil & Gas Company regarding Accounts Receivable."[47] By return letter dated October 28, 2009, Campbell enclosed a check in the same amount "to fully settle the Accounts Receivable issue that we have been working on since Titan/Heritage purchased our propane business in October 2007."[48] Campbell further noted that they would not provide any more details relating to the accounts receivable and that, by accepting the check, AmeriGas was agreeing and understanding that fact.[49] AmeriGas subsequently negotiated the check.[50] The Court concludes that the offer and acceptance of these terms, along with the consideration provided by both parties, created a binding and enforceable release.

40.     AmeriGas contends that the CM Lindsay and Antioch Baptist accounts were not part of the release in the AR Agreement because Campbell did not disclose the fact that it had received the payment of those accounts.[51] It is undisputed, however, that Campbell provided to AmeriGas information regarding the Current AR it was purchasing at or around the time of the closing of the asset sale, and provided additional information

---

[47] Compl., Ex. A.
[48] Compl., Ex. B.
[49] *Id.*
[50] Ans. ¶ 41 (admitting that the check for $156,286.46 was negotiated).
[51] *See* Def.'s Reply Supp. Mot. Summ. J. 12. As a final note, while AmeriGas has relied on theories of fraud and conversion to show that it had a valid claim under the APA such that withholding was proper, AmeriGas has not argued that the AR Agreement was fraudulently induced or is otherwise invalid. AmeriGas' sole argument against the release appears, as noted above, to be that the CM Lindsay and Antioch Baptist accounts were not part of the settlement reflected in the AR Agreement.

regarding those accounts for two years following the sale. It is undisputed that CM Lindsay and Antioch Baptist were identified to AmeriGas as Current AR accounts that it was purchasing, and that the balance owed on those accounts was provided to AmeriGas on at least two occasions.[52] AmeriGas made no efforts to collect those accounts.

41. Even if AmeriGas did not know that CM Lindsay and Antioch Baptist had paid the Current AR to Campbell and this constituted an "unknown" claim, by agreeing that it had "no further claims" and "fully settle[d]" the AR issues, AmeriGas released both its known and unknown claims in the AR Agreement. *Merrimon v. Postal Telegraph-Cable Co.*, 207 N.C. 101, 105-06 (1934) (recognizing that "[t]he language in a release may be broad enough to cover all demands and rights to demand or possible causes of action . . . whether or not the various demands or claims have been discussed or mentioned, and whether or not the possible claims are all known"). *Accord Talton v. Mac Tools, Inc.*, 118 N.C. App. 87, 90-91 (1995) ("Since this language was broad enough to cover all possible causes of action, whether or not the possible claims are all known, plaintiffs cannot rely on their ignorance of facts giving rise to a claim for fraud as a basis for avoiding the release."). The Court also concludes that plain and broad language used by the parties, and the background facts surrounding the information provided to AmeriGas about the Current AR, establishes that the release covered any existing claims related to the accounts receivable issue between the parties including the CM Lindsay and Antioch Baptist accounts.

42. To summarize, although Campbell's failure to forward the payments for Current AR made by CM Lindsay and Antioch Baptist created a claim pursuant to section 8.5(f) of the APA, AmeriGas released the claim by entering into the AR Agreement. Accordingly, AmeriGas breached the APA when it withheld $111,107.83 from the 2010 and

---

[52] Dep. Ex. 68, 73.

2011 payments to Campbell. Therefore, for the reasons stated above, the Court concludes that with regard to Plaintiffs' First and Second Claims Relief for breach of contract,[53] to the extent that those claims are premised on AmeriGas' withholding of $111,107.83, Campbell's motion for summary judgment should be GRANTED, and AmeriGas' motion for summary judgment should be DENIED.

Tank Remediation

43.    In its First Claim, Campbell also contends that AmeriGas breached the APA by withholding the cost of the tank remediation work. AmeriGas did so pursuant to section 8.5(f) of the APA, alleging that Campbell breached the representations in sections 7.3, 7.4, and 7.5. Campbell contends that it did not breach any representations and warranties regarding the customer storage tanks and, even if it had, AmeriGas was not entitled to offset the first $250,000.00 of the cost because the deductible provision in section 10.1 of the APA.

44.    In support of its position Campbell makes two arguments. First, it contends that AmeriGas has not introduced any evidence that the 319 non-compliant customer tanks were actually owned by Campbell and part of the assets sold to AmeriGas, as opposed to being customer-owned tanks that were not part of the sale of assets. Second, Campbell contends that section 7.3 of the APA is the exclusive provision that warrants that storage tanks were in compliance, and that section only represents that the Owners did not have

---

[53] As to Claim Two, the Court concludes that this claim is not barred by the statute of limitations. While AmeriGas contends that its letter of August 3, 2010, denies the existence of the AR Agreement and thus triggers the statute of limitations, *see Henlajon, Inc. v. Branch Highways, Inc.*, 149 N.C. App. 329, 335 (2002), the Court disagrees. Instead, that document simply threatens a breach of the AR Agreement and does not, as AmeriGas suggests, contain the sort of express denial of the existence of an agreement as in *Henlajon, Inc. See* Dep. Ex. 6 (August 3, 2010 letter). Accordingly, the Court concludes that the statute of limitations was triggered on the date of the breach of the AR Agreement, in October 2010. *See Abram v. Charter Med. Corp.*, 100 N.C. App. 718, 720 (1990) (noting that "with a breach of contract action, the claim accrues upon breach"). Plaintiffs filed their Complaint on August 6, 2013, within the statute of limitations.

actual knowledge of non-compliant tanks. Since it is undisputed that the Owners did not have actual knowledge, there can be no violation of section 7.3.

45.     In support of its motion for summary judgment, AmeriGas argues that tank compliance is governed not only by section 7.3, but also by sections 7.4 and 7.5 of the APA. Since sections 7.4 and 7.5 are specifically excluded from the deductible in section 10.1, AmeriGas was entitled to offset the entire cost of remediation. AmeriGas also contends that even if only section 7.3 applies, they still were entitled to withhold the cost of remediation because (a) by its plain language, the deductible in section 10.1, discussed below, applies only to Sellers, and not to Owners, and (b) Campbell had knowledge that there were non-compliant tanks.

46.     As an initial matter, the Court is not persuaded by Campbell's position that AmeriGas failed to prove that the storage tanks were part of the assets actually sold by Campbell. In the Complaint, Campbell specifically alleged that the "tanks were the property of Campbell" and were "[a]mong the propane gas assets Campbell sold to AmeriGas."[54] Campbell is bound by this allegation. *Woods v. Smith*, 297 N.C. 363, 368 (1979) ("A party is bound by his pleadings and, unless withdrawn, amended, or, otherwise altered, the allegations contained in all pleadings ordinarily are conclusive as against the pleader."). Accordingly, the Court now turns to the disagreement between the parties regarding which provisions of the APA govern the tank remediation issue and, then, to the applicability of section 10.1.

47.     As noted above, the parties disagree as to which APA provisions govern the tank compliance dispute at issue here. Campbell contends only section 7.3 governs tank compliance, while AmeriGas argues that sections 7.3, 7.4, and 7.5 can all be read to address

---

[54] Compl. ¶ 48.

the specific compliance concerns with the tanks at issue. The Court will address all three provisions.

48. First, in section 7.4 of the APA Campbell represented and warranted that "[t]here is no suit, action, arbitration, or legal, administrative, or other proceeding, or governmental investigation pending" affecting the Operations except for those expressly disclosed, and that "[n]o Seller has received any notice that it is under investigation with respect to any alleged violation of any provision of federal, state, local law or administrative regulations with respect to the Operations." AmeriGas argues that Campbell's failure to disclose the May 2007 notices regarding the non-compliant storage tanks was a violation of section 7.4. There is no record evidence, however, that at the time of the closing Campbell was under any ongoing investigation related to the tank compliance issue, or that the tank compliance issue had resulted in other then-pending legal or administrative issue. Instead, the notices simply note the existence of a violation and instruct Campbell to repair the problem before the inspector's next visit.[55] No additional action on the part of the Department of Agriculture is taken or even threatened. The Court concludes that the State notices regarding the non-compliant tanks do not constitute a "legal, administrative, or other proceeding, or governmental investigation" within the meaning of section 7.4. Accordingly, the failure to disclose the notices was not a violation of section 7.4 that would entitle AmeriGas to an offset.

49. Section 7.5 is titled "No Violation of Governmental Regulations." In section 7.5, Campbell states in pertinent part that "[t]he Operations and the Property have not been, and were not prior to the day of the Closing, conducted in any material violation of any statute, law, ordinance, or regulation of any governmental entity." The remainder of section

---

[55] *See id.*

7.5 contains additional representations regarding real property transferred from Campbell to AmeriGas, including representations about zoning, environmental, and other compliance.

50.    The parties strongly dispute the applicability of section 7.5 to the storage tank compliance dispute. AmeriGas contends that the first sentence of section 7.5 broadly encompasses all property conveyed by Campbell,[56] and is not limited to real property assets. Campbell contends that the first sentence of section 7.5 must be read in context with the remainder of the section which focuses primarily, if not exclusively, on the regulatory compliance of real property. Campbell argues that section 7.5 is limited to real property compliance issues and would not govern the tank compliance dispute.

51.    Campbell's reading, however, is inconsistent with the plain language of the first sentence of section 7.5. *Lynn v. Lynn*, 202 N.C. App. 423, 431 (2010) ("When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court . . . and the court cannot look beyond the terms of the contract to determine the intentions of the parties."). That section states that the "Property" sold by Campbell to AmeriGas has not been "conducted in any material violation of any statute, law, ordinance, or regulation of any governmental entity."[57] As noted above, the APA expressly defines "Property" as including the customer storage tanks.  The representation and warranty in the first sentence is not limited to real property.  There is nothing inconsistent about the broad representation in the first sentence of section 7.5 and the more specific representations in the remainder of the section regarding compliance with particular environmental and zoning laws and regulations. For example, section 7.5 also warrants that the Real Property is not only properly zoned, but that the real property at which Plant Facilities are operated is not

---

[56] "Property," as used in the APA is defined as all assets listed in section 1 of the APA, including customer tanks and real property. APA § 1.
[57] APA § 7.5.

grandfathered under any previous zoning ordinances. Similarly, section 7.5 also contains specific representations regarding compliance with environmental regulations. These additional representations do not conflict with the general representation that begins section 7.5, but simply supplement that general representation to address issues related to compliance with specific regulations and laws.

52.     Campbell contends that such an interpretation of section 7.5 renders section 7.3 meaningless as violations of the latter section would necessarily be subsumed by the former.[58] The Court disagrees. By their plain language, sections 7.3 and 7.5 contain different representations. Section 7.3 of the APA, titled "Tangible Personal Property," provides in pertinent part as follows:

> All tangible property transferred to [AmeriGas] hereunder is in good operating condition and is suitable for its current use and, where appropriate, such property is in compliance with (i) the rules and regulations of the applicable authorities for the storage and handling of propane, (ii) with the current National Fire Protection Association Pamphlet No. 58 . . ., and (iii) the requirements and standards as promulgated by the United States Department of Transportation for LP gas products . . . . To the knowledge of Sellers and Owners, all of the Property being transferred (including only the 18,873 Customer Tanks and their installation and the vehicles) complies with all relevant governmental codes and good operating practices and safety standards in the propane business and the State of North Carolina.

53.     As is clear from its plain language, section 7.3 warrants generally that the tangible personal property Campbell is transferring to AmeriGas "is in good operating condition and suitable for its current use," and more specifically that the customer storage tanks are in compliance with three sets of regulations or standards. Section 7.5, which applies to all property and operations, warrants that they are not in violation of any governmental law or regulation, but makes no representations regarding the working condition or suitability for use of any personal property. While the two sections have some

---

[58] Pls. Br.. Supp. Mot. Summ. J. 20 ("Indeed, AmeriGas' interpretation of Section 7.4 and 7.5 would render superfluous *the entirety* of Section 7.3.") (emphasis in original).

overlap, that overlap falls far short of rendering one provision meaningless as the two sections can be read together. *See In re Foreclosure of a Deed of Trust*, 210 N.C. App. 409, 415 (2011) ("[O]ur courts adhere to the central principle of contract interpretation that [t]he various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect.").

54.     Similarly, the Court also must reject Campbell's argument that "the specific terms of [s]ection 7.3 supersede the general terms of" section 7.5.[59] Generally, "cannons of contract construction hold that 'when general terms and specific statements included in the same contract *and there is a conflict*, the general terms should give way to the specifics." *Lail v. Cleveland Cnty. Bd. of Educ.*, 183 N.C. App. 554, 563 (2007) (internal citations omitted) (emphasis added). While there is room for overlap between these sections, as noted above, Campbell has not shown the existence of any conflict between the provisions in sections 7.3 and 7.5 of the APA, and the Court concludes that no such conflict exists.

55.     As to whether the transfer of non-compliant customer tanks constitutes an independent violation of section 7.3, the Court first notes Campbell's contention that a violation of section 7.3 requires the knowledge of the violation.[60] Campbell bases this position on the final sentence of section 7.3, which only represented that the storage tanks were in compliance "[t]o the knowledge of Sellers and Owners." As an initial matter, this interpretation appears to ignore the preceding representations, which are not limited to the knowledge of Campbell, that all property transferred was in good operating condition, suitable for its current use, and in compliance with the enumerated regulations and standards. However, even assuming Campbell's interpretation of that section is correct, the

---

[59] Pls.' Br. Supp. Mot. Summ. J. 19.
[60] Campbell also argues that, despite using the phrase "knowledge of Sellers and Owners" in section 7.3, the knowledge requirement in this section is limited to the actual knowledge of the Owners, based on the definition of knowledge in section 12.9 of the APA.

Court has already concluded that the transfer of noncompliant tanks constituted a violation of section 7.5, which contains no knowledge requirement. Because no conflict exists between sections 7.3 and 7.5, and because those provisions can be read in harmony, even if Campbell did not breach section 7.3, the transfer of noncompliant tanks still constituted a breach of the APA. Accordingly, the Court now turns to whether the deductible provided in section 10.1 applies to the financial cost of that violation.

56.     Section 10.1 provides that the Sellers and Owners will jointly and severally indemnify AmeriGas for any damage arising out of, among other things, "the breach of any covenant or agreement made by any Seller and/or the Owners" in the APA.[61] That section, however, also provides that "[s]ellers shall have no liability . . . with respect to claims under Section 10.1 until the total of all Damages with respect to such matters exceeds two hundred fifty thousand dollars . . . and then only for the amount by which such Damages exceed two hundred fifty thousand dollars."[62] The deductible provision expressly states that it does not apply to breaches of sections 7.2, 7.4, 7.5, or 7.8 "or to any breach of any of Sellers' representations and warranties of which the Sellers had knowledge" prior to the representation.[63]

57.     By its plain language, the deductible does not apply to breaches of section 7.5. The Court has concluded that, in transferring the non-compliant tanks, Campbell breached section 7.5 of the APA. Accordingly, AmeriGas properly withheld the entire cost of tank remediation, as the deductible in section 10.1 was inapplicable.

58.     The Court concludes that the sale of noncompliant tanks constituted a breach of section 7.5 and that AmeriGas was entitled to offset the entire cost of remediation.

---

[61] APA § 10.1.
[62] *Id.* (emphasis added).
[63] *Id.*

Accordingly, the Court concludes that to the extent Campbell claims that AmeriGas breached the APA by withholding from payments for the cost of tank remediation, AmeriGas' Motion for Summary Judgment as to Claim One should be GRANTED, and Campbell's Motion for Summary Judgment as to that claim should be DENIED.

### Non-compete Agreement

59.     In its Third Claim for Relief, Campbell seeks a declaratory judgment finding that the non-competition restriction in the APA "is not valid" and is "unenforceable." Campbell and AmeriGas each have moved for summary judgment in their respective favor on Campbell's claim for declaratory judgment. In addition, AmeriGas has alleged a counterclaim for "anticipatory breach" of the non-competition agreement.[64] Alternatively, in the event the Court declares the non-competition agreement unenforceable, AmeriGas makes a claim for unjust enrichment seeking return of the amounts it paid to Campbell as consideration for the non-competition restrictions. Campbell has moved for summary judgment on AmeriGas' counterclaims.

### Excused Performance

60.     Campbell argues that the non-competition agreement cannot be enforced against them because AmeriGas breached the agreement by withholding from the 2010 and 2011 payments. At the time it filed the Complaint, Campbell alleged that despite AmeriGas' alleged breach of its obligations Campbell "ha[s] continued to complied with the terms of the Covenant without exception."[65]   Since the filing of the Complaint, however, Campbell has reentered the propane business in breach of the non-competition agreement, but contends that AmeriGas' breach of its payment obligations excuses Campbell's performance under the

---

[64] AmeriGas filed its counterclaim for anticipatory breach in September 2013, after Campbell had announced the acquisition of Brooks, but before Campbell started operating the competing propane business.  The Court will treat AmeriGas' current claim as one for breach of contract.
[65] Compl. ¶ 59.

agreement. AmeriGas contends that even if it improperly withheld payments, that breach does not excuse Campbell's performance because Campbell waived the right to terminate their own performance by accepting the partial payments from AmeriGas.

61. In North Carolina, a party may waive the breach of a contractual provision. The North Carolina Supreme Court has recognized that

> While the breach of a continuing contract may justify a termination of the contract by the innocent party, the mere fact a breach of one of the provisions of the contract has been committed by one party does not necessarily accomplish that result, as the party not in fault may elect to waive the breach and continue performance regardless of the breach.
>
> Where there is a breach of a contract or some provision there of which does not go to the substance of the whole contract and indicate an intention to repudiate it, the breach may be waived by the innocent party. *Non constat* such breach, he may elect to treat the contract as still subsisting and continue performance on his part.

*Wheeler v. Wheeler*, 299 N.C. 633, 638 (1980) (citations omitted). Accordingly,

> [A]fter one party has breached a contractual provision, the nonbreaching party has a choice between alternate courses of conduct. He may terminate his further liability and recover damages or he may continue the contract, choosing to receive the promisee's defective performance and regarding his right to damages as adequate compensation.

*Id.* at 637.

62. In order to establish a waiver of a breach of contract, the party asserting waiver must establish that:

(1) The waiving party is the innocent, or nonbreaching party, and
(2) The breach does not involve total repudiation of the contract so that the nonbreaching party continues to receive some of the bargained-for consideration . . . ., and
(3) The innocent party is aware of the breach, and
(4) The innocent party intentionally waives his right to excuse or repudiate his own performance by continuing to perform or accept the partial performance of the breaching party.

*Id.* at 639. "The presumption is that a party's intentional election to continue performing or receiving performance after knowledge of a breach is an indication that he does not consider

the contract totally repudiated and in fact probably still receives considerable benefit under it." *Id.* at 640.

63.     Here, Campbell alleges that it is the "innocent" or non-breaching party.[66] It is undisputed that AmeriGas did not totally repudiate the agreement. Rather, it made partial payments in 2010 and 2011, and paid over $1.6 million of the required $2 million in payments under the non-competition agreement. Campbell clearly received the vast majority of the bargained-for consideration. Campbell became aware of AmeriGas' alleged breach when Campbell did not receive the full payments in 2010 and 2011.[67] It is undisputed that Campbell continued to accept, and retained, the periodic payments, including the full $500,000 payment in 2012.[68] Nothing in the record indicates that Campbell qualified its acceptance of those payments, or otherwise attempted to reserve any right it may have had to terminate its own performance.[69] Instead, the evidence establishes that Campbell intentionally waived its right to excuse its own performance by accepting partial payments and failing to terminate the non-competition agreement, and instead choosing to pursue recovery of damages in this lawsuit.[70] Accordingly, the Court concludes that Campbell waived its right to terminate its own performance under the non-compete.[71]

---

[66] *See* Compl. ¶ 59 (alleging that, "[s]ince the closing, Plaintiffs have fully complied with the terms of the Covenant without exception.").

[67] *See* Compl. ¶¶ 44 (alleging that "AmeriGas informed Campbell that it was withholding . . . payments . . . which were due under the non-compete portion of the APA.").

[68] *See* Dep. Ex. 11 at 5, No. 4.

[69] *Cf. G.E.B., Inc. v. QVC, Inc.,* 129 F.Supp. 2d 856, 862-63 (M.D.N.C. 2000) (finding that acceptance of a check as partial payment while informing payor that recipient was specifically accepting as partial payment and still believed that deficiencies existed did not waive right to terminate performance).

[70] As AmeriGas recognizes, such waiver does not prevent Campbell from recovering damages from any breach of the APA, but only waives Campbell's right to terminate its own performance based on any such breach. Def.'s Reply Br. 3; *Wheeler*, 299 N.C. at 637.

[71] Campbell appears to conflate AmeriGas' waiver argument in this case with the doctrine of "accord and satisfaction." Pls.' Br. Opp. Def.'s Mot. Summ. J. p..20. AmeriGas has not argued that Campbell agreed to and accepted partial payments in satisfaction of AmeriGas' full payment obligation, or that Campbell has waived its rights to pursue the remainder of those payments. Rather, AmeriGas' contends only that Campbell's acceptance of the partial payments without any reservation of rights

*Validity of the Non-compete*

64.     Campbell also challenges the validity and enforceability of the non-competition restriction on the grounds that it is unreasonable because it (a) prohibits Campbell from engaging in the electric and natural gas businesses, (b) restricts Campbell from competing for a period of 10 years, and (c) prohibits Campbell from competing within a 100 mile radius of any former Campbell facility sold to AmeriGas.

65.     In North Carolina, covenants restricting competition generally are "not viewed favorably in modern law." *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 311 (1994). While these covenants are closely scrutinized when they are used to bar an employee from competing with a former employer,[72] restrictive covenants obtained as part of the sale of a business are subject to less stringent analysis. *Beverage Sys. of the Carolinas, LLC v. Assoc. Beverage Repair, LLC*, __ N.C. App. __, __, 762 S.E.2d 316, 320 (2013); *Seaboard Indus., Inc. v. Blair*, 10 N.C. App. 322, 333 (1971). Courts have recognized that covenants not-to-compete in connection with the sale of a business "enable the seller . . . to sell his good-will and thereby receive a higher price; and they also furnish a material inducement to the purchaser who purchases a business with the hope of retaining its customers." *Seaboard Indus., Inc.*, 10 N.C. App. at 333. Accordingly, a covenant-not-to compete obtained as part of the purchase of a business "is valid and enforceable (1) if it is reasonably necessary to protect the legitimate interest of the purchaser; (2) if it is reasonable with respect to both time and territory; and (3) if it does not interfere with the interest of the public." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 662-63 (1968); *Beverage Sys.*, 762 S.E.2d at 320. Whether a non-competition

and without terminating the non-competition agreement waived its right to claim that it was not bound by the agreement.

[72] *See A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 402 (1983).

agreement is reasonable is decided as a matter of law by the Court. *Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, __ N.C. App. __, __, 747 S.E.2d 256, 264 (2013).

66.    Campbell does not argue that the non-compete at issue here interferes in any way with the interest of the public. Additionally, nothing in the record indicates that the non-compete unduly limits access to propane in the territory covered by the non-compete, or otherwise carries any significant public impact. Accordingly, the Court concludes that the non-compete satisfies this requirement.

67.    Campbell contends that AmeriGas had no legitimate business interest in prohibiting Campbell from competing in the natural gas and electric generation businesses. Campbell argues that these prohibitions constitute an impermissible attempt to eliminate competition for AmeriGas' propane business.[73] AmeriGas contends, however, that the natural gas and electric generation businesses compete directly with propane sales.[74]  Plaintiff has not offered any evidence to dispute this contention.  The Court concludes that AmeriGas had a legitimate interest in restricting Campbell from engaging in other businesses that are directly competitive with propane in order to protect the customers and operations purchased by AmeriGas, as well as the goodwill associated with Campbell's propane business.[75]

68.    Campbell also challenges the ten year duration of the non-competition restrictions in the agreement as unreasonable. Campbell argues that the 10 year restriction was unnecessary to protect AmeriGas' interests, particularly as the business involved here is the sale of a "simple commodity."[76] Campbell also notes that AmeriGas has ceased using the Campbell name in at least some locations it purchased from Campbell. AmeriGas counters that "the propane industry generally is comprise[d] of small businesses that have

---

[73] Pls.' Br. Supp. Mot. Summ. J. p. 26.
[74] Hamilton Aff. ¶ 8.
[75] *See* APA § 1 (noting goodwill among assets purchased by AmeriGas).
[76] Pls.' Br. Supp. Mot. Summ. J. pp. 26-27.

strong relationships within the community," and that it continues to use the Campbell name at some locations.[77]

69.     As our court of appeals has recently noted, in the context of a sale of a business, time restrictions "of ten, fifteen and twenty years . . . have been upheld by the Supreme Court of North Carolina." *Beverage Sys.*, 762 S.E.2d at 320-21 (citing *Seaboard Indus.*, 10 N.C. App. at 335). *See also Jewel Box Stores Corp.*, 272 N.C. App. at 663-64 (collecting cases in the sale of business context, including cases in which lifetime restrictions have been upheld in North Carolina). The restrictions here were included in a large, negotiated transaction between relatively sophisticated commercial business entities. The non-competition agreement acknowledges the value of the goodwill that AmeriGas is acquiring and that AmeriGas had "legitimate business interest" in seeking the "special and unique" restrictions.[78]  In exchange for these restrictions, AmeriGas agreed to pay an additional two million dollars over a period of five years.[79] Not only does the amount of this payment suggest the value to both parties of this bargained-for provision, but the five year payment schedule indicates that AmeriGas had a strong, ongoing, interest in securing compliance by providing substantial consideration for the restrictions over an extended period of time.

70.     Ultimately, while the 10 year restriction appears to the Court to be at the outer limits of reasonableness under the facts present here, the Court concludes that the 10 year restriction serves a legitimate business purpose and is reasonable under the circumstances.

71.     Finally, Campbell challenges as unreasonably broad the geographic scope of the non-competition covenant. Even in the sale of business context, our court of appeals has noted that "restriction as to territory is reasonable only to the extent it protects the legitimate

---

[77] Def.'s Br. Opp. Pls.' Mot. Summ. J. pp. 25-26.
[78] APA § 8.5(d).
[79] APA § 8.5(a).

interests of the employer in *maintaining* its customers," *Beverage Sys.*, 762 S.E.2d at 321

(quoting *Hartman*, 117 N.C. App. at 312), and "the reasonableness of a geographic restriction

depends upon where the business' customers are located and [whether] the geographic scope

of the covenant is necessary to maintain those customer relationships." *Outdoor Lighting*

*Perspectives,* 747 S.E.2d at 264. Courts have found geographic restrictions unreasonable

when they are not tied to the location of the customers of the buyer or the seller. *Beverage*

*Sys.*, 762 S.E.2d at 321.

72.     It is undisputed that, at or around the time of the sale of its propane business,

Campbell generally served customers within a 25 mile radius of its facilities.[80] On occasion,

Campbell had customers up to 40 miles away from its offices.[81] The non-competition

covenant, however, prohibits Campbell from competing within a 100 mile radius around any

of the facilities sold to AmeriGas.[82] The size of the Restricted Area would prohibit competition

from the Sellers and Owners in a significant portion of North Carolina, and in portions of

South Carolina, in which Campbell never had any propane customers.[83]

73.     AmeriGas argues that the geographic area of a restrictive covenant "may

extend to the area where customers of the seller *and buyer* are located,"[84] but provided no

specific evidence regarding where AmeriGas' facilities or customers were located.  Instead,

AmeriGas asserts only that "AmeriGas did business in North Carolina prior to the acquisition

---

[80] Campbell Dep. 100.

[81] Julian Dep. 79.

[82] APA § 8.5(a)(1). These Plant Facilities are located in Burgaw, Cerro Gordo, Clinton, Elizabethtown, Laurinburg, Lumberton, Macclesfield, McDonald, Nashville, Raleigh, Supply, Wallace, Whiteville, and Zebulon, North Carolina. APA, Recitals ¶ A.

[83] At the hearing, Campbell provided the Court with maps illustrating the territory that would be covered by drawing a 100 mile radius around the most central facility located in Clinton, North Carolina, and territory covered if one drew 25 mile radii around each of the 10 separate facilities Campbell sold to AmeriGas.  The 100 mile radius around Clinton alone covered significant territory outside of Campbell's general 25 mile service radius.

[84] Def.'s Br. Supp. Mot. Summ. J. p.. 18.

of Campbell, and generally served customers up to fifty mile away from its offices."[85] There is no evidence demonstrating that the 100 mile radius around Campbell's former facilities protected any of AmeriGas' existing customers.

74. In support of the reasonableness of the restriction, AmeriGas contends that this restriction "protects a 50-mile service radius because sales of propane outside the Restricted Area could result in the delivery of propane inside the Restricted Area."[86] AmeriGas notes that two hypothetical propane businesses, each with a 50-mile service radius, located 50 miles apart will compete for customers within their overlapping service radii.[87] Thus, argues AmeriGas, a 100-mile restriction was necessary to adequately protect its investment in its acquired propane business. While the Court recognizes that the 100-mile restriction would resolve the issues raised by overlapping service areas, imposing such a restriction also drastically changes the character and scope of the restriction. In eliminating the overlapping service area, the 100-mile restriction still bars Campbell from competing in a substantial area where it had no former customers and AmeriGas has no operations.

75. The restriction in the non-competition goes beyond what is necessary to protect AmeriGas' interests in maintaining customers and encompasses a significant area where neither Campbell nor AmeriGas had customers. *See Beverage Sys.*, 762 S.E.2d at 321. Accordingly, the Court concludes that the geographic restriction in the non-compete is unreasonable, and therefore unenforceable.

76. The conclusion that the non-competition agreement is unreasonable does not, however, end the Court's analysis. Instead, AmeriGas urges the Court to enforce the

---

[85] Hamilton Aff. ¶ 10.
[86] Def.'s Br. Supp. Def.'s Mot. Summ. J. 19 (citing Hamilton Aff. ¶¶ 9-10).
[87] *Id.*

provision "to the greatest extent reasonable," based on the language of the covenant itself.[88]

That language provides:

> If the terms of this Section 8.5 are held by any court or agency to be unenforceable because of the period of time in which those terms remain in effect, the breadth of the activities restricted, or the breadth of the geographical area of the limitations, then, nevertheless, this section shall be deemed to have been amended to limit that time period, those activities, or that area to the longest time period, the broadest activities and the largest geographical area (not to exceed those set forth in this section) as will be enforceable.[89]

77.     While North Carolina abides by the strict blue-pencil doctrine, which limits the ability of a court to revise an unenforceable non-compete by choosing not to enforce divisible portions of the covenant,[90] the North Carolina Court of Appeals has recognized that a covenant itself can provide authority to revise its terms. In *Beverage Systems*, the court of appeals found a covenant's geographic scope unreasonable based on the lack of customers in a portion of the restricted area. 762 S.E.2d at 320. That covenant, however, specifically provided "that the court shall be allowed to revise the restrictions . . . to cover the maximum period, scope and area permitted by law." *Id.* Based on that language, the court of appeals concluded that "the trial court's ability to revise the non-compete is not subject to the restrictions of the 'blue pencil doctrine'" and should have revised the restrictions "to make it reasonable on the evidence before it." *Id.* at 321-22.

78.     In support of its holding in *Beverage Systems*, the court of appeals concluded that enforcing a provision permitting a court to revise a restrictive covenant "makes good business sense" and better protects the interests of the seller and purchaser, noting that strict adherence to the "blue pencil doctrine" may no longer make sense in light of "a rapidly

---

[88] Def.'s Reply Br. 9-10.

[89] APA § 8.5(e).

[90] Under North Carolina's traditional application of the blue-pencil doctrine, the Court would be without authority to revise the geographic scope of the noncompete as the entire geographic scope provision is unreasonable and not comprised of distinctly separable provisions, such as local geographical or governmental units. *Cf. Welcome Wagon Int'l, Inc. v. Pender*, 255 N.C. 244, 248 (1961).

changing economy." *Bev. Sys.*, 762 S.E.2d at 322. Finally, the court of appeals opined that potential buyers may be unwilling to purchase a business if they feared a non-competition agreement "could not be modified and enforced by the courts," noting the former owner of the businesses at issue "agreed to sign the non-compete and was compensated for that agreement" but was now "ask[ing] the courts to hold the negotiated-for non-compete invalid." *Id.* at 322-23. The factual scenario in *Beverage Systems* is highly similar to the case at bar, where it is undisputed that Campbell received and accepted the annual payments under the non-compete totaling more than $1.6 million only to purchase a competing propane business in direct violation of the non-compete.

79. In this case then, the critical inquiry is whether section 8.5(e) manifests an intent to allow the Court to amend the non-competition agreement at issue here. The Court recognizes that the language in section 8.5(e) is not as explicit as that in *Beverage Systems*. The plain language of section 8.5(e), however, establishes that the parties recognized that a "court" would be the entity charged with determining whether the non-competition restriction was enforceable, and that a court might find the agreed upon geographic scope of the restrictions to be unenforceable. The language used by the parties also establishes that they intended for the geographic area to be revised to make the covenant legally enforceable. While the phrase "deemed to have been amended" does not expressly place the authority to amend with a court, providing that the geographic area is deemed amended to the largest "enforceable" area necessarily requires a determination of what geographic scope is legally enforceable. Such a determination can only be made by a court of competent jurisdiction. The Court concludes that read as a whole, section 8.5(e) reflects that parties' intent that a court would make any amendment or revision to the geographic scope of the restrictive covenant necessary for it to be "deemed" enforceable.

80.     As noted above, the only provision of the non-compete that is unreasonable, and therefore unenforceable, is the geographic restriction. While, under the circumstances, a 100-mile radius restriction is unreasonable, the Court believes that a narrower restriction would be reasonable. The record evidence reflects that Campbell sold propane to customers located a maximum of 40 miles away from any of its offices, and that AmeriGas generally serves customers up to 50 miles from their office locations. AmeriGas, however, did not produce evidence regarding the locations of any existing North Carolina propane operations or customers that it had prior to purchasing Campbell. This Court has no factual basis upon which to determine whether AmeriGas had customers in areas that require protection. *See Beverage Sys.*, 762 S.E.2d at 321, n. 2. Accordingly, the Court concludes that a territorial limitation of a 40 mile radius is reasonable, and the non-compete, pursuant to section 8.5(e), should be revised to reflect that the Restricted Area only includes an area within a 40-mile radius of any of the Plant Facilities.

81.     Accordingly, Plaintiffs' Motion, to the extent it seeks entry of summary judgment in Plaintiffs' favor on Plaintiffs' Third Claim and Defendant's First Counterclaim, should be DENIED, and Defendant's Motion, to the extent it seeks summary judgment in Defendant's favor on Plaintiffs' Third Claim should be GRANTED.

THEREFORE, IT IS ORDERED that:

82.     As to Plaintiffs' First Claim, to the extent that claim is premised on AmeriGas' withholding of $111,107.83 related to the accounts receivable dispute, Plaintiffs' Motion is GRANTED and Defendant's Motion is DENIED.

83.     As to Plaintiffs' First Claim, to the extent that claim is premised on AmeriGas' withholding of the full cost of tank remediation work, Plaintiffs' Motion is DENIED and Defendant's Motion is GRANTED.

84. As to Plaintiffs' Second Claim, Plaintiffs' Motion is GRANTED and Defendant's Motion is DENIED.

85. As to Plaintiffs' Third Claim, Plaintiffs' Motion is DENIED and Defendant's Motion is GRANTED in part, as follows.

a. The non-compete agreement in section 8.5 of the APA is valid and enforceable, when the geographic limitation is reduced to a 40-mile radius. The non-compete, pursuant to section 8.5(e) is hereby deemed amended to reflect that reduction.

86. As to Defendant's First Counterclaim, Plaintiffs' Motion is DENIED.

87. Based on the Court's ruling on Plaintiffs' Claim Three, Defendant's Second Counterclaim is hereby dismissed as MOOT.

This the 15th day of January, 2016.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
 for Complex Business Cases